# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>GEORGE LAMERE,<br><br>    Defendant. | No. CR05-4104-MWB<br><br>**REPORT AND RECOMMENDATION ON MOTION TO SUPPRESS** |

_____

This matter is before the court on the defendant's motion to suppress evidence (Doc. No. 13) and amended motion to suppress (Doc. No. 17). Pursuant to the trial management order (Doc. No. 10), motions to suppress in this case were referred to the undersigned United States Magistrate Judge for review, and the issuance of a report and recommended disposition. Accordingly, the court held a hearing on the motions on November 17, 2005, at which Assistant U.S. Attorney John Lammers appeared on behalf of the plaintiff (the "Government"), and the defendant George Lamere appeared in person with his attorney, Alexander Esteves. The Government offered the testimony of Task Force Officer Dane Wagner.

The motion now has been fully submitted, and the court turns to consideration of the defendant's motion to suppress.

## *BACKGROUND FACTS*

In late May 2005, a confidential informant (("CI") told law enforcement officers he could buy methamphetamine from Bryan Tenold, who was selling drugs out of a used

car dealership in Sioux City, Iowa. Officers set up a controlled drug buy for May 25, 2005. When the CI arrived at the car lot to buy the drugs, Tenold left the office and went out onto the lot, where he got into a maroon Jeep vehicle and pulled it into the mechanic's bay of the dealership. Tenold reached inside the Jeep and pulled out a cigarette pack that contained an ounce of crystal methamphetamine. Officers checked the license plates for the vehicle and learned it was registered to the parents of Audrea Huls.

On May 31, 2005, officers brought Tenold in for questioning. Tenold told officers Huls was his primary source of supply for methamphetamine. He agreed to cooperate with law enforcement in investigating Huls and others connected with her. Tenold told the officers Huls's supplier was a person named Roger who lived on Grandview Avenue in Sioux City. Officers were able to identify this individual as Roger Perales. Tenold stated Huls drove back and forth from Cedar Rapids, Iowa, to Sioux City, for the purpose of picking up methamphetamine from Perales. According to Tenold, Huls sometimes traveled with a man named Manape. TFO Wagner had known the defendant George Manape Lamere personally for many years, having lived across the street from him in high school, and realized that the man known to Tenold as "Manape" was Lamere. For the preceding year, officers had been receiving information from suspects and informants indicating Lamere was involved in selling methamphetamine. Tenold told officers that during the week between May 25 and May 31, 2005, he had driven to Ft. Dodge, Iowa, and had purchased one-half ounce of crystal methamphetamine from Lamere.

Tenold told officers Huls was coming back to Sioux City on June 2, 2005, to get another shipment of methamphetamine from Perales. He agreed to call Huls to ask about her trip. Officers recorded the call, during which Huls pressed Tenold about a $1200 drug debt he owed her. Huls was insistent that Tenold pay her as soon as she got to Sioux City, because she owed her supplier for drugs she had fronted to Tenold. Tenold expected Huls

and Lamere to arrive at Perales's house sometime close to 7:00 p.m. on June 2, 2005. Officers initiated surveillance of Perales's house on Grandview Avenue. At 7:08 p.m., the same Jeep vehicle from which Tenold had retrieved the methamphetamine on May 25, 2005, pulled up in front of Perales's house. Officers observed a man and a woman get out of the vehicle. TFO Wagner immediately identified Lamere as the man who exited the vehicle, and officers assumed – and later confirmed – that the woman was Huls.

Huls and Lamere went inside Perales's residence. After about half an hour, Huls came out alone and drove to Tenold's house so Tenold could repair the brakes on the Jeep vehicle. While Tenold was working on the Jeep in his garage, he and Huls talked about the drug debt Tenold owed to Huls. Huls told Tenold she could not front him any more drugs until he paid the $1200 debt. She indicated Perales wanted Tenold to sign over the title to his car as collateral for the drug debt. Approximately every ten minutes during the conversation, Tenold would make an excuse to go inside the house so he could call TFO Wagner to report on the progress of the conversation. TFO Wagner told Tenold not to agree to sign over his car title to Perales. Instead, TFO Wagner and Tenold concocted a plan to set up a controlled drug buy from Huls. Tenold told Huls he would contact his uncle in South Dakota, and arrange for his uncle to purchase one ounce of crystal methamphetamine for $1200, $200 of which would go toward the drug debt. The plan was for the fictitious "uncle" to be an undercover officer.

When Huls left Tenold's residence, he called TFO Wagner to report that Huls was on her way back to Perales's house. Huls arrived at Perales's residence about five minutes later.

On June 3, 2005, Tenold called Huls to set up the transaction between Huls and Tenold's fictitious uncle. Officers were present during the phone conversations. At the officers' direction, Tenold attempted to arrange for the buy to occur in a public area that

3

would be easy for officers to watch. However, Huls changed the location, and told Tenold to meet her at a gas station. Huls arrived at the location alone, driving her Jeep vehicle. She told Tenold and his "uncle," who was the undercover officer (the "UC"), to follow her, and she led them to another location, where she parked on the side of the street. Tenold got out of his vehicle and got into Huls's vehicle to discuss the transaction. Tenold was wearing a wire that allowed officers to listen to his conversation with Huls. Huls said she needed the money first, and then she would go get the drugs. TFO Wagner testified this is a common practice among drug dealers. However, as directed by the UC, Tenold declined. He said his uncle had the money with him and would be willing to follow Huls to go get the drugs, but he would not give her the money until the drugs were present. Huls asked to meet Tenold's uncle. The UC went to Huls's Jeep and got into the back seat. Huls looked back at him and immediately began saying things like, "Why are you in my car? I don't know what you're talking about. Get out of my car!" At that time, Tenold and the UC could not explain Huls's behavior; however, they later learned the UC had made contact with Huls about a year earlier, in connection with another matter, and Huls obviously had recognized the UC as a police officer.

Huls left the location and drove quickly back to Perales's house. She entered the residence, and did not leave again until several hours later. Officers observed Huls and Lamere get into the Jeep and leave Perales's residence. Officers attempted to maintain surveillance of the Jeep but lost visual contact when the vehicle was driving eastbound on Gordon Drive/Highway 20. Huls apparently continued to proceed eastbound because another officer located the vehicle east of Sioux City on Highway 20. Officers stopped Huls's vehicle near Lawton, Iowa, on Highway 20, and they arrested Huls and Lamere. A search of Huls's vehicle incident to her arrest yielded small quantities of methamphetamine in the center console, and about a quarter pound of methamphetamine

4

hidden underneath the dashboard on the driver's side, by the vehicle's firewall. Officers searched Lamere incident to his arrest, but no incriminating evidence was found on Lamere's person.

Although Lamere concedes he lacks standing to challenge the search of Huls's vehicle, *see United States v. Green*, 275 F.3d 694, 699 (8th Cir. 2001), he argues officers lacked probable cause to stop the vehicle at all. No traffic violation had been committed, and he argues they lacked probable cause to arrest Huls at the time she was stopped. Therefore, he argues all the evidence flowing from the illegal stop of Huls's car must be suppressed. In the alternative, Lamere argues that even if officers had probable cause to stop Huls's vehicle and arrest her, they lacked probable cause to arrest him.

Immediately preceding the hearing, Lamere filed an amended motion to suppress in which he also seeks suppression of certain statements he claims to have made at the time of his arrest, before he was advised of his *Miranda* rights. However, the parties have reviewed the videotape of the traffic stop, and the Government has advised the court that no statements of consequence were made by Lamere prior to the time he was advised of his rights, and the Government does not intend to offer any such statements at the time of trial. Lamere has been unable to identify any specific statements he allegedly made prior to being advised of his rights. Therefore, to the extent the amended motion to suppress seeks suppression of statements Lamere made at the time of his arrest, the motion should be denied.

## DISCUSSION

The Eighth Circuit Court of Appeals has explained that "[i]n determining whether probable cause exists to make a warrantless arrest, the court looks to the totality of the circumstances to see whether a prudent person would believe the individual ***had committed***

or was committing a crime." *United States v. Segars*, 31 F.3d 655, 659 (8th Cir. 1994) (emphasis added). "Reasonable suspicion" means "specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Garcia-Camacho*, 53 F.3d 244, 246 (9th Cir. 1995). Officers may consider all the evidence available to them, regardless of whether or not each component would support a finding of probable cause by itself. *See United States v. Ramos*, 42 F.3d 1160, 1163 (8th Cir. 1994) ("A trained officer may properly infer from a collection of circumstances, no one of which itself indicates illegal activity, that further inquiry is appropriate.")

Here, the court must determine from the totality of the circumstances whether a prudent officer would have believed Huls had been or continued to be engaged in criminal activity at the time she was stopped on the highway.

> [This] objective, reasonable-man test is appropriate because, unlike a subjective test, it "is not solely dependent either on the self-serving declarations of the police officers or the defendant nor does it place upon the police the burden of anticipating the frailties or idiosyncracies of every person whom they question."

*Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, 3151, 82 L. Ed. 2d 317 (1984) (quoting *People v. P.*, 233 N.E.2d 255, 260 (1967)).

The court finds the officers had probable cause to stop Huls's vehicle and arrest her. They had information from Tenold that he had purchased methamphetamine from Huls and from Lamere. They had conducted a controlled buy of drugs that were retrieved from a vehicle registered to Huls's parents, and which she later drove to Sioux City after talking with Tenold about a trip to obtain more drugs. They had recorded conversations in which Huls pressed Tenold to repay a drug debt. Until Huls recognized the undercover officer, Huls was prepared to complete a drug transaction with Tenold's "uncle." All of the

information Tenold gave to officers regarding Huls's and Lamere's activities had proved to be accurate.

The court finds the officers reasonably believed Huls had been and continued to be involved in conspiring to transport and distribute methamphetamine at the time they stopped her vehicle and arrested her. Significantly, the officers did not need to believe Huls was involved in criminal activity at the time of the stop; their belief could have involved conduct that occurred prior to that time. As the Eighth Circuit Court of Appeals explained in *United States v. Zevala*, 427 F.3d 562 (8th Cir. 2005):

> "Probable cause to conduct a warrantless arrest exists when at the moment of arrest police have knowledge of facts and circumstances grounded in reasonably trustworthy information sufficient to warrant a belief by a prudent person that an offense ***has been*** or is being committed by the person to be arrested." *United States v. Hartje*, 251 F.3d 771, 775 (8th Cir. 2001) (citing *Beck v. Ohio*, 479 U.S. 89, 91, 85 S. Ct. 223, 13 L. Ed. 2d 142 (1964)).

*Zevala*, 427 F.3d at 565 (emphasis added). Therefore, even if officers lacked information that Huls currently had drugs in her vehicle, they still had probable cause to stop and arrest her.

Having arrested Huls, officers could search the passenger compartment of her vehicle incident to her arrest. *See New York v. Belton*, 453 U.S. 454, 460, 101 S. Ct. 2860, 2864, 69 L. Ed. 2d 768 (1981); *United States v. Riedesel*, 987 F.2d 1383, 1388 (8th Cir. 1993). The officers had a reasonable, articulable suspicion that Lamere was involved with Huls in transporting and distributing methamphetamine, justifying their detention of Lamere during their search of Huls's vehicle. *See United States v. Navarrete-Barron*, 192 F.3d 786, 791 (8th Cir. 1999). Once the officers discovered drugs in the vehicle, they also had probable cause to arrest Lamere.

7

Simply stated, Lamere has failed to show the officers' stop of Huls's vehicle and his subsequent arrest violated his Fourth Amendment rights. As a result, his motion to suppress and amended motion to suppress should be denied.

## *CONCLUSION*

For the above reasons, **IT IS RESPECTFULLY RECOMMENDED** that the defendants' motions to suppress be **denied**.

Any party who objects to this report and recommendation must serve and file specific, written objections by **December 5, 2005**. Any response to the objections must be served and filed by **December 9, 2005.**

**Any party planning to lodge objections to this report and recommendation must order a transcript of the hearing promptly.**

**IT IS SO ORDERED.**

**DATED** this 28th day of November, 2005

*[signature]*

PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT